**UNITED STATES of America**

v.

**Arthur J. PAPPATHANASI, Nicholas A. Scangas, Defendants.**

**No. CR.03–10305–MLW.**

United States District Court,
D. Massachusetts.

Aug. 24, 2005.

David Duncan, Zalkind, Rodriguez, Lunt & Duncan, Norman S. Zalkind, Zalkind, Rodriquez, Lunt & Duncan, Boston, MA, for Arthur J. Pappathanasi, Defendant.

Martin G. Weinberg, Oteri, Weinberg & Lawson, M. Goldstein, Boston, MA, for Nicholas Scangas, Defendant.

John M. Hodgens, Jr., U.S. Attoneys Office, Worcester, Peter A. Mullin, United States Attorney's Office, John Joseph Moakley Federal Courthouse, Boston, MA, for U.S., Plaintiff.

### MEMORANDUM AND ORDER

WOLF, District Judge.

This memorandum is based on the transcript of the decision rendered orally on February 28, 2005, in which the court allowed the defendants' motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). This memorandum adds some citations, clarifies some language, and refines some discussion.

### I. SUMMARY

The Superceding Indictment alleges that defendants Arthur Pappathanasi and Nicholas Scangas, both executives of West Lynn Creamery ("WLC"), conspired with Dunkin' Donut franchisees to help them evade taxes in violation of 18 U.S.C. § 371. The alleged conspiracy involved a rebate program for the sale of light cream by WLC to Dunkin' Donut stores, in which WLC allegedly gave franchisees inflated invoices and then rebated the difference back to them in checks and cash. The franchisees then were able to pocket the rebate money without declaring it on the relevant income tax returns.

On July 9, 2004, the defendants filed a motion to dismiss the original indictment. The court denied that motion on November 23, 2004. The government subsequently filed the Superceding Indictment on December 16, 2004. On January 4, 2005, the defendants filed a motion to dismiss the Superceding Indictment, and the court denied that motion on January 24, 2005.

After the government presented its case in a four-week jury trial, the defendants moved for judgments of acquittal.

### II. ANALYSIS

In considering a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(a):

> [T]he court must look at the evidence in the light most favorable to the government. This evidence includes both direct evidence and circumstantial evidence. The court must draw reasonable inferences in favor of the government. It must resolve all credibility questions and evidentiary conflicts in favor of the government. The court must decide if the evidence is sufficient to permit a rational jury to find each essential fact to have been proven beyond a reasonable doubt. The government is not bound by all of the evidence it presents. However, if the government introduces evidence contrary to the inferences it wants the jury to draw, it must introduce other direct or circumstantial evidence to relieve itself of the effect flowing from the evidence introduced. The evidence must be sufficient to prove the fact at issue beyond a reasonable doubt. However, the government does not have to rule out every hypothesis congenial to a finding of innocence.

*United States v. Sampson,* 335 F.Supp.2d 166, 201 (D.Mass.2004) (citing First Circuit cases).

The First Circuit has addressed the standard for appellate review of the sufficiency of evidence in terms that are also relevant to the instant Rule 29 motion:

> A reviewing court should refrain from second guessing the ensuing conclusions as long as, one, the inferences derived support a plausible rendition of the record; two, the conclusions flow rationally from those inferences. However, juries do not have carte blanche. The appellate function, properly understood, re-

quires the reviewing court to take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt.

*United States v. Spinney,* 65 F.3d 231, 234 (1st Cir.1995).

Jury verdicts have significant value to the administration of justice and this court has very rarely granted a motion for a judgment of acquittal. However, Federal Rule of Criminal Procedure 29(a) expressly states that the court must enter a verdict of acquittal if the evidence is insufficient to sustain the verdict. *See Burks v. United States,* 437 U.S. 1, 10, n. 5, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The court has scrutinized the trial record in the context of the complex law and has concluded that it does not have the legitimate discretion to allow the jury to decide this case because the evidence presented is not sufficient.

The defendants are charged with participating in a § 371 *Klein* conspiracy. In essence, a conspiracy is an agreement, spoken or unspoken, to commit a crime. To prove a conspiracy, the government must prove beyond a reasonable doubt that: (1) the agreement specified in the agreement and not some other agreement existed between at least two people; (2) that the defendant being focused upon willfully joined that agreement; and (3) that one of the conspirators committed an overt act, meaning an act that was an effort to achieve the purpose of the conspiracy. First Circuit Pattern Jury Instructions (Criminal) § 4.18.371(1) (2003); *United States v. Rivera–Santiago,* 872 F.2d 1073, 1078–80 (1st Cir.1989); *United States v. Piper,* 35 F.3d 611, 614–15 (1st Cir.1994).

To act willfully means to act knowingly and not by accident or mistake, with specific intent to disobey or disregard the law. First Circuit Pattern Jury Instructions (Criminal) § 4.18.371(1).

In this case, the defendants, Pappathanasi and Scangas, are accused of conspiring with Dunkin' Donuts franchisees to overstate the expenses and conceal some of the taxable income of those franchisees in order to assist the franchisees in defrauding the IRS and paying less taxes than the franchisees actually owed. To prove this charge, the government must prove that a particular defendant had both an intent to agree with specific Dunkin' Donuts franchisees and an intent to assist the franchisees' efforts to defraud the Internal Revenue Service. *See* First Circuit Pattern Jury Instructions (Criminal): § 4.18.371(1) (2003); *United States v. Adkinson,* 158 F.3d 1147, 1155 (11th Cir. 1998).

It is not sufficient for the government to prove only that a defendant acted in a way that would have furthered the goals of a conspiracy if there was one. *Adkinson,* 158 F.3d at 1155. In this case, the government must prove by independent evidence that there was a tax conspiracy in progress and that a defendant knowingly and voluntarily joined that conspiracy. *Id.*

The government also must prove that a purpose of the conspiracy was to interfere with the proper functioning of the IRS and that any fraud was not merely a foreseeable consequence of a conspiratorial agreement. *See United States v. Goldberg,* 105 F.3d 770, 773, 774 (1st Cir.1997); *Adkinson,* 158 F.3d at 1155.

The mere collateral effects of jointly agreed-to activity, even if generally foreseeable, are not necessarily an object of the conspiracy. *Id.* In *Goldberg,* for exam-

ple, the First Circuit stated that it would not be sufficient for the government to prove only that a defendant agreed to pay someone under the table knowing that he had no intention of reporting the money to the IRS. *Goldberg,* 105 F.3d at 774. Rather, the government must prove beyond a reasonable doubt that a defendant entered into a spoken or unspoken agreement with the taxpayer and that a purpose of that agreement was to assist the taxpayer to defraud the IRS. *Id.*

The most important paragraphs of the Superseding Indictment include paragraphs 8 and 9, under the caption, "The Conspiracy." They are the paragraphs that describe the conspiracy alleged in this case. Paragraph 8, particularly, describes the conspiracy of which the government must prove a defendant was a member. It states:

> Beginning at least as early as 1987, continuing until at least in or about December 1998, in Lynn and elsewhere in the District of Massachusetts, the defendants, Arthur J. Pappathanasi and Nicholas A. Scangas, did knowingly, willfully, and unlawfully combine, conspire, and agree together and with others known and unknown to the grand jury to defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental functions of the Internal Revenue Service (the "IRS") of the United States Department of the Treasury in the ascertainment, computation, assessment, and collection of revenue, to wit, income taxes of Dunkin' Donuts franchises, their owners, and others, by concealing taxable income from the IRS and overstating expenses.

Superceding Indictment, ¶ 8. Therefore, the government must prove a conspiracy between the defendants and Dunkin' Donuts franchisees to conceal taxable income from the IRS.

In paragraph 9 of the Superceding Indictment, the grand jury alleged that "the essence of the conspiracy was an agreement, an understanding among the defendants and the coconspirators, to defraud the United States by means of a sham rebate program, in which WLC issued falsely inflated invoices to Dunkin' Donuts customers and others for light cream and other products and then rebated the amount of the falsely inflated invoice in a form which the customer *would* use to evade taxation" (emphasis added).

In the original indictment, paragraph 9 alleged that West Lynn Creamery had a sham rebate program that Dunkin' Donuts franchisees *"could"* use to evade taxes. After the November 2004 hearings on the motion to dismiss, the government realized that it would be insufficient to prove only that the defendants knew that the rebate program *"could"* be used by Dunkin' Donuts franchisees to evade taxes, rather than that it *"would"* be used to evade taxes. *See Goldberg,* 105 F.3d at 774. Therefore, the government obtained the Superseding Indictment that substituted the word "would" for the word "could" in paragraph 9. Nevertheless, the original misconception regarding what is required to prove a *Klein* conspiracy may have contributed to the government's problems in this trial.

Paragraph 25 of the Superseding Indictment, under the caption "Manner and Means," states that "WLC would and did make efforts to conceal the 'rebate' program from the IRS." Paragraph 43, the last paragraph in the "Overt Acts" section of the Superseding Indictment, states that:

> [i]n or about December 1998, WLC failed to produce in response to a subpoena, and concealed from the IRS, numerous WLC records relating to the rebate program, including yellow checks, blue checks, blue check registers, cash

receipt journals, rebate instruction documents, portions of monthly rebate files, and other rebate related documents.

While paragraph 8 charged a conspiracy to conceal income from the IRS, it did not allege that the purported original agreement included an agreement between defendants and Dunkin' Donuts franchisees that WLC would, if necessary, not produce records to the IRS. WLC responded to an October 1997 subpoena for records related to franchisee Michael Gavriel. It is not alleged that the response to the Gavriel subpoena constituted an overt act in furtherance of the conspiracy. Nor is there evidence that would support such an allegation.

The evidence viewed in the light most favorable to the government would be sufficient to prove the following. Beginning in the 1960s, WLC had a rebate program in which Dunkin' Donuts franchisees and some others were billed at a high price and later received rebates, usually by check, that could have been used by the franchisees to conceal income and evade taxes. Some franchisees used the program for this purpose. This program was established by Bob Walsh of WLC.

There is no evidence that any Dunkin' Donuts franchisee discussed the tax implications of the rebate program with Bob Walsh or told him that they were not paying taxes on the rebate money. However, one franchisee, Paul Govostes, testified that Bob Walsh told him that the rebate program was "very safe" or "bulletproof".

Bob Walsh agreed to pay several of the Dunkin' Donuts franchisees in cash. He caused his son, Jim Walsh, to deliver cash to some of the franchisees.

In 1987, Pappathanasi became the chief executive officer of WLC, and Scangas became a sales executive. The men are cousins. WLC was a company that was founded by Nicholas Scangas' father and the elder Scangas' brothers, the uncles of Pappathanasi and Scangas.

Pappathanasi and Scangas each knew that the rebate program existed and that it could be used by Dunkin' Donuts franchisees to evade federal taxes. They knew that the fact that the invoices existed at higher prices would facilitate tax evasion if the franchisees did not report the rebates to the IRS. Pappathanasi and Scangas regarded the program as a service to franchisees.

The rebate program also had other purposes, including facilitating credit to Dunkin' Donuts franchisees and providing WLC with a "float," meaning the use of money it would not otherwise have, without interest, for 30 to 60 days.

There is not any direct evidence that Pappathanasi or Scangas ever discussed the tax implications of the rebate program for franchisees before the October 1997 grand jury subpoena for Gavriel's records. There is also no direct evidence that Pappathanasi or Scangas discussed the tax implications of the rebate program with Bob Walsh or Jim Walsh.

The circumstantial evidence is not sufficient to prove that Pappathanasi and Scangas discussed these matters with each other or with anybody else. Bob Walsh did report to Pappathanasi when Pappathanasi became the Chief Executive Officer of WLC. Many other employees reported to Pappathanasi as well.

Pappathanasi and Scangas attended some meetings together. Pappathanasi signed checks and other rebate documents regularly. Scangas also signed some of the rebate checks.

There is no evidence that Pappathanasi and Scangas ever discussed with each other any of the Dunkin' Donuts franchisees

identified in the Bill of Particulars as their coconspirators: Paul Govostes, Ted Foundas, Michael Gavriel, Gus Dettore, Robert Weiss, Carlos Andrade, Jason Dubinsky, Mark Dubinsky, and Harold Crockett.

With the exception of Foundas, discussed below, neither Pappathanasi nor Scangas ever spoke to a Dunkin' Donuts franchisee about taxes or whether the rebate program was being used to evade taxes. In fact, most of the alleged coconspirators, including Dettore and Weiss, Mark Dubinsky, Gavriel, and Govostes, identified in the Bill of Particulars never spoke to Pappathanasi or Scangas regarding anything.

Scangas authorized Jim Walsh to pay Andrade's rebate monthly in cash. No one told Pappathanasi prior to the October 1997 subpoena for Gavriel documents that cash payments were being made to Andrade or anybody else. After the October, 1997 subpoena and an investigation by WLC's attorney, Michael Altman, Pappathanasi told Jim Walsh to stop making cash payments.

As discussed later in the context of the necessary *Petrozziello* rulings, the court does not find that the government has proven by a preponderance of the evidence that Foundas had a conversation of the sort he described with Pappathanasi on the golf course. For the purposes of the Rule 29 motion, however, the court must and does assume that the golf course conversation occurred. Therefore, the court assumes for the purpose of the Rule 29 analysis that the jury could believe Foundas and find that in 1994, on the golf course, Foundas said to Pappathanasi, "I am concerned about the amount of money we are getting and not paying taxes on. I hope we are not going to get caught by the federal government." The court also assumes that Pappathanasi responded, as Foundas testified, that Foundas "should

not worry because we are not going to get caught because there are two sets of books." There is no evidence that Pappathanasi told Scangas about this purported conversation.

WLC had records of the rebate program. It was widely known at WLC. It was not kept secret.

When the grand jury issued a subpoena for the Gavriel rebate records in October 1997, WLC produced the required documents. Pappathanasi had all of the rebate records assembled after that initial subpoena and had them put in an office next to his. The rebate program was ended in January or February 1998.

Pappathanasi and Scangas knew that Gavriel had pled guilty and was cooperating with the government's investigation of WLC. All of the WLC rebate records were subpoenaed by the grand jury for production in December 1998. Some were produced, but many checks and some other records were not produced and have not been found.

There is no evidence that Pappathanasi or Scangas discussed the 1998 subpoena or the failure to produce documents with any Dunkin' Donuts franchisee. There is no evidence that Bob Walsh or anyone else ever spoke with Dunkin' Donuts franchisees regarding what WLC would do if there was a government investigation of the rebate program. There is also no evidence that Scangas was involved in responding to the 1998 subpoena or that he discussed that subpoena with Pappathanasi.

The facts viewed in the light most favorable to the government are not sufficient to prove a § 371 *Klein* conspiracy, as such a conspiracy was defined by the First Circuit in *Goldberg*, 105 F.3d at 774. As the First Circuit explained, a conspiracy can have multiple purposes. Interfering with

government functions must be proven to be a purpose of a conspiracy and not just a foreseeable effect of joint action taken for other reasons. *See id.* at 774–75.

*Goldberg* involved both the use of false invoices and the filing of false tax documents with the Internal Revenue Service by Goldberg. In finding the evidence sufficient to sustain the guilty verdict, the First Circuit wrote:

> [W]e leave untouched the general precept, namely, that mere collateral effects of jointly agreed-to activity, even if generally foreseeable, are not mechanically to be treated as an object of the conspiracy. *This would be a different case if, without filing false tax documents, Goldberg had agreed with his partners to pay Jones under the table, knowing that Jones had no intention of reporting the money to the IRS. If the difference is in degree then, here the degree matters.*

*Id.* at 774 (emphasis added). The First Circuit characterized *Goldberg* as falling within "the outer bounds" of § 371. *Id.* at 775.

In this case, neither of the defendants nor WLC filed any false documents with the IRS, though such a filing is not always essential to proving a *Klein* conspiracy. Some of the Dunkin' Donuts franchisees' rebates were paid in cash, and it could be inferred that Scangas knew that they might not pay taxes on the money and that the invoices would facilitate any effort by a franchisee to evade taxes. The First Circuit in *Goldberg,* however, indicated that foreseeing that the franchisees might not pay taxes would not be enough to prove participation in a *Klein* conspiracy. *Id.* at 774. The government characterizes the pertinent statement by Judge Boudin for the First Circuit as dicta. However, even if dicta, it was written to provide guidance, and it guides this court.

The lack of sufficient evidence of an agreement by Pappathanasi or Scangas to enter a *Klein* conspiracy, however, is not the only fatal flaw in the government's evidence. Even if WLC was engaged in a *Klein* conspiracy with the Dunkin' Donuts franchisees, the evidence viewed in the light most favorable to the government is not sufficient to prove that Pappathanasi and Scangas intended to agree with each other and Dunkin' Donuts franchisees to become members of that conspiracy.

The government has to prove beyond a reasonable doubt that a defendant intended to agree with at least one alleged coconspirator. *Adkinson,* 158 F.3d at 1153. Although the connection of the defendant to the alleged tax conspiracy needed only to be slight, the government must demonstrate with substantial proof that there was in fact some connection. *Id.* at 1152, n. 10. The government must prove a meeting of the minds to commit an unlawful act. *Id.* at 1154. It may do so with direct and/or circumstantial evidence. *Id.*

In *Adkinson,* the government "was unable to point to one conversation between the defendants regarding taxes, much less demonstrating an intent to avoid them." *Id.* This lack of a conversation contributed to the finding that the direct and circumstantial evidence was insufficient to prove their membership in the alleged conspiracy.

With the exception of the purported golf course conversation between Pappathanasi and Foundas, the same is true here. *United States v. Gurary,* 860 F.2d 521, 524 (2nd Cir.1988), a case on which the government has relied, involved direct evidence indicating that the defendants knew fictitious invoices were used to prepare fraudulent tax returns. *Gurary* explained the illegal tax advantages to a middleman. *Id.* The defendants also met to discuss the

IRS investigation, instructed witnesses on their testimony, and continued the scheme after those discussions. *Id.* There is no comparable evidence in this case.

The evidence is sufficient to prove that the defendants knew that the rebate program *could* be used by some franchisees if the franchisees decided to evade taxes. Indeed, such knowledge was alleged in the original indictment to be the essence of the conspiracy. There is no evidence, however, that Pappathanasi and Scangas discussed the use of the program to evade taxes with each other or with any Dunkin' Donuts franchisee. The direct and circumstantial evidence viewed most favorably to the government is sufficient only to show that some franchisees decided on their own to evade taxes. With the exception of Foundas, none of them claimed to have discussed doing so with either defendant.

The evidence is not sufficient to prove that Bob Walsh and WLC entered into a *Klein* conspiracy, as defined in *Goldberg.* However, even assuming that the evidence is adequate to prove that WLC and Bob Walsh were coconspirators, the facts that the defendants knew about the rebate program and took actions to perpetuate it are not sufficient to prove that they intended to agree with each other and the Dunkin' Donuts franchisees to join a conspiracy to impede the IRS. The direct and circumstantial evidence, even when viewed in the light most favorable to the government, is insufficient to prove the necessary meeting of the minds.

■ It is a close question whether the purported golf course conversation between Foundas and Pappathanasi would be sufficient to prove a conspiracy between the two of them to impede the IRS, but it is a close question that is not material in the context of the charges in this case. There is no evidence connecting Scangas

to the conversation or to a possible narrower conspiracy between Pappathanasi and Foundas.

Moreover, a conspiracy between Pappathanasi and Foundas is not the conspiracy alleged in the Superceding Indictment. Allowing Pappathanasi to be convicted of this narrower conspiracy would violate his substantial rights and would, therefore, be impermissible. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Fenton,* 367 F.3d 14 (1st Cir.2004); *United States v. Portela,* 167 F.3d 687 (1st Cir. 1999); *United States v. Glenn,* 828 F.2d 855 (1st Cir.1987).

■ Because a single conspiracy was alleged, the court allowed testimony from about five groups of Dunkin' Donut franchisees. The evidence is insufficient, however, to establish a single conspiracy under *Kotteakos* and its progeny. Rather, the evidence, at best, relates to a possible hub, WLC, with independent spokes, each of the Dunkin' Donuts franchisees who evaded taxes. This would be, at best, multiple conspiracies, the hub and spoke without the rim.

Among other things, a single conspiracy requires an interdependence among participants. *Portela,* 167 F.3d at 695. To be interdependent, "activities of one aspect of the scheme must be necessary or advantageous to the success of another aspect of the scheme. Each individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key," *Id.; see also United States v. Wilson,* 116 F.3d 1066, 1076 (5th Cir.1997); *Glenn,* 828 F.2d at 857–59.

The totality of the circumstances that the evidence could prove in this case is insufficient to establish that the Dunkin' Donuts franchisees conspired with each

other in one conspiracy with WLC at the hub. The success of one franchisee in evading taxes did not depend on the efforts of any others, and there is no evidence that the franchisees thought it did.

It is true that if one franchisee got caught, that could generate an investigation which might lead to the identification of other franchisees who were evading taxes. However, this is also true of thieves selling to a common fence, which the Supreme Court in *Kotteakos* stated would be insufficient to establish one conspiracy. *See* 328 U.S. at 755, 66 S.Ct. 1239. In essence, the Supreme Court was saying that if one robber who sold to a particular fence was caught and the evidence led to the fence, the identification of the fence could foreseeably lead to other people doing business with the fence, but that is not sufficient to establish a single conspiracy. *Id.* Similarly, the evidence in this case is not sufficient to prove the required interdependence.

If Pappathanasi had been charged only with conspiring with Foundas, the court would not have permitted any evidence by the other Dunkin' Donuts franchisees. The issue would have required a Federal Rules of Evidence 404(b) and 403 analysis. The testimony of the other franchisees who did not claim to have had any conversations about the rebate program with Pappathanasi would not have been relevant to his intent, because he did not discuss rebates or taxes with them. If the court had been persuaded that there was some special probative value that would permit the admission of their testimony under Rule 404(b), it would have found Rule 403 to have operated to exclude this evidence because the risk of unfair prejudice to both Pappathanasi and Scangas would have substantially outweighed its probative value.

The evidence regarding franchisees other than Foundas would also not have been admissible against Scangas if he were an alleged coconspirator in a narrower Pappathanasi–Foundas conspiracy. The jury, however, heard from many franchisees other than Foundas. No limiting instruction could cure the unfair prejudice of that at this point.

Pappathanasi's and Scangas' substantial rights have been irreparably injured. The government essentially acknowledged this fact on February 25, 2005, when it agreed that it would be very difficult to justify submitting a conspiracy with only Foundas to the jury. Therefore, a judgment of acquittal is necessary and appropriate. *See Kotteakos,* 328 U.S. at 754–55, 66 S.Ct. 1239; *United States v. Dworken,* 855 F.2d 12, 24 (1st Cir.1988).

Although it is not material to the final analysis that a judgment of acquittal for both defendants is proper, the court finds also that they have been unfairly prejudiced by the admission of substantial evidence concerning WLC's failure to produce documents in response to the December 1998 subpoena for all rebate records, which is charged as an overt act in paragraph 43 of the Superceding Indictment.

The evidence is insufficient to prove beyond a reasonable doubt that any destruction of documents as part of a cover-up was part of any original conspiratorial agreement to help the franchisees evade taxes rather than an effort to protect WLC, and possibly Pappathanasi, Scangas, and others after an investigation of the franchisees had begun.

There are distinct requirements for evidence of a cover-up to be included in the initial conspiracy, which were established by the Supreme Court in *Grunewald v. United States,* 353 U.S. 391, 402–405, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), and ad-

dressed by the First Circuit in *United States v. Twitty*, 72 F.3d 228 (1st Cir. 1995). In *Twitty*, the First Circuit wrote:

[W]e read *Grunewald* to impose a special burden to show that an express agreement to conceal was, or at least became, part of the central conspiratorial agreement and that the later acts relied upon were in furtherance of this agreement.

*Id.* at 234.

In *Grunewald*, the facts included the following. The alleged conspiracy was to fix tax cases by bribing a person in the IRS. The indictment specifically alleged that it was part of the conspiracy that the defendants would make continuing efforts to avoid detection and prosecution by lying and covering up. 353 U.S. at 394, n. 3, 77 S.Ct. 963.

It was also alleged that the conspiracy continued until after the statute of limitations for assessing taxes expired. *Id.* at 398, 77 S.Ct. 963. The evidence showed that after the investigation started, the defendants caused the disappearance of records and repeatedly warned taxpayers to keep quiet. *Id.* at 403, 77 S.Ct. 963.

The Supreme Court held that circumstantial evidence that a conspiracy was kept secret and coconspirators took care to cover up their crime to escape detection and punishment was not enough to prove that concealment of the crime was part of the initial agreement among the coconspirators. *Id.* at 402, 77 S.Ct. 963. The Court emphasized that there was no direct evidence to show an express original agreement to cover up. *Id.* at 403–4, 77 S.Ct. 963. Thus, on the government's first theory, the evidence was inadequate.

The Court did remand the case for a retrial on the issue of whether the central object of the conspiracy had been achieved at the time of the cover-up. *Id.* at 415, 77 S.Ct. 963. The Court held that on the evidence presented, a properly instructed jury might have found that the object of the original conspiracy was to protect the taxpayers until the statute of limitations expired. *Id.* at 410–11, 77 S.Ct. 963. Therefore, it ordered a retrial so that a properly instructed jury could decide if the acts of concealment were to protect the defendant's interests and had only an incidental effect on protecting the taxpayers or if they were part of the original conspiracy. *Id.* at 415, 77 S.Ct. 963.

In the instant case, in paragraphs 8 and 9, which describe the conspiracy, the Superceding Indictment does not allege that a cover-up, if necessary, was part of the original agreement. In addition, the Superceding Indictment alleges in paragraph 8 that the conspiracy ended in 1998, not three or six years later when the time for assessing taxes for statute of limitations purposes would have expired. This absent allegation in the Superceding Indictment suggests that the grand jury did not intend to allege that an agreement to cover-up was part of the original conspiracy.

There is no evidence of any discussion of a possible cover-up before the Gavriel investigation was disclosed to the defendants in 1997. There is no evidence of any discussion of a cover-up with any any of the Dunkin' Donuts franchisees at any time.

According to Foundas, in the purported conversation on the golf course, Pappathanasi said to Foundas that WLC had two sets of books. Foundas did not claim that Pappathanasi said that the records would be destroyed or not produced if an investigation began. There is no evidence that Scangas and Pappathanasi discussed the production of documents with each other in connection with the 1998 subpoena.

Thus, there is no express agreement to cover-up that could be proven by the evidence. Indeed, there is no evidence that

Scangas was involved in responding to the 1998 subpoena, although if he were a co-conspirator and that were an overt act in furtherance of the conspiracy, he would be responsible for it.

It is undisputed that WLC complied with the Gavriel subpoena in 1997. This strongly suggests that a failure to produce documents in 1998 was not part of any original conspiracy but, at most, was the result of a decision in 1998 to attempt to protect WLC.

In these circumstances, the evidence is not sufficient to prove beyond a reasonable doubt that the failure to produce documents was part of any original conspiratorial agreement.

Finally, the defendants' substantial rights have been prejudiced because the court conditionally admitted many hearsay statements which do not constitute admissible coconspirator hearsay under Federal Rule of Evidence 801(d)(2)(E), and a limiting instruction would not be effective at this point. Essentially, the court anticipated this outcome in November 2004 when it noted on several occasions that it would conditionally admit, over the defendants' arduous objections, the testimony that the government sought to introduce under Federal Rule of Evidence 801(d)(2)(E), but the court expected that such evidence would be so pervasive that if it decided it was not properly admitted, no limiting instruction would cure the prejudice.

To admit those statements finally, the court would have to find that they were made in furtherance of a conspiracy of which a defendant was or became a member. *See* Fed.R.Evid. 801(d)(2)(E); *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977). It does not have to be the conspiracy alleged in the indictment. *Dworken*, 855 F.2d at 24. However, the conspiracy must be proven by a prepon-derance of the credible evidence. *Petrozziello*, 548 F.2d at 23.

With regard to *Petrozziello* rulings, the court does not look at the evidence in the light most favorable to the government; rather, it must assess credibility. *Earle v. Benoit*, 850 F.2d 836, 842 (1st Cir.1988); *United States v. Dray*, 659 F.Supp. 1426, 1436 (D.Mass.1987). As explained earlier, in this case the evidence viewed in the light most favorable to the government is insufficient to prove beyond a reasonable doubt that the charged conspiracy existed or that Pappathanasi and Scangas agreed to become members of any such conspiracy. The credible evidence also does not prove by a preponderance that the charged *Klein* conspiracy existed or that Scangas or Pappathanasi was a member of any such conspiracy.

In addition, the credible evidence does not prove by a preponderance that the purported conversation on the golf course between Foundas and Pappathanasi occurred in the course of a narrower conspiracy between them. Indeed, the government has not proven by a preponderance of the credible evidence that the golf course conversation occurred at all. It has not proven that Foundas told Pappathanasi that he was not paying his taxes on the rebate money and expressed concern. It has also not proven by a preponderance of the credible evidence that Pappathanasi told Foundas not to worry because there were two sets of books.

As the court regularly instructs juries, statements of cooperating witnesses must always be scrutinized carefully because of their incentive to lie and blame others. First Circuit Pattern Jury Instructions (Criminal) § 2.08 (2003); *United States v. Simonelli*, 237 F.3d 19, 29 (1st Cir.2001). The court had the opportunity to observe Foundas. His demeanor did not suggest that he was a credible person, and his

testimony did not suggest that he was a credible person. He regularly shifted blame to other people on a range of issues. He did not originally remember if the purported conversation on the golf course was with Pappathanasi or Angie Scangas, or the year that it occurred. Subsequently, as time passed, somehow his memory got better and better. He remembered that: he spoke with Pappathanasi and not Angie Scangas; that the conversation occurred in 1994; and at trial he said, apparently for the first time, that the conversation occurred on the sixteenth hole at a particular point on the fairway.

The court finds that Foundas was not truthful, that he was inventing facts he did not recall in an effort to assist the government and try to help himself in connection with his sentencing.

For all of the foregoing reasons, Pappathanasi and Scangas' Rule 29 motions are meritorious. They are, therefore, hereby ALLOWED. Accordingly, judgments of acquittal shall be entered.