# United States Court of Appeals
## For the First Circuit

---

No. 05-1593

UNITED STATES OF AMERICA,

Appellee,

v.

GEORGE L. UPTON,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Lynch, Chief Judge,

Lipez and Howard, Circuit Judges.

---

Richard B. Klibaner, with whom Klibaner & Sabino, was on brief for appellant.
John-Alex Romano, Attorney, Criminal Division, United States Department of Justice, with whom Michael J. Sullivan, United States Attorney and William F. Bloomer, Assistant United States Attorney, were on brief, for appellee.

---

March 5, 2008

---

**HOWARD**, **Circuit Judge**.  A jury convicted George Upton of conspiracy to commit money laundering.  In this appeal, he argues that, by the time of his indictment, the statute of limitations period had run on all of his conduct except for the filing of a false tax return and the failure to file a tax return.  Upton asserts that, under governing Supreme Court precedent cabining the government's ability to charge continuing conspiracies based on subsequent acts of cover-up, the two tax offenses were not part of the conspiracy.  From this premise he contends both that he was entitled to a jury instruction on the statute of limitations and that the evidence was insufficient to convict him of conspiracy to launder money within the applicable limitations period.  He also claims that the district court erred in admitting a hearsay statement as an excited utterance.  We affirm.[1]

## I.

### A.  Background Facts

For purposes of assessing the sufficiency claim, we recite the facts in the light most favorable to the verdict.  See United States v. Boulanger, 444 F.3d 76, 89 (1st Cir. 2006).

Upton owned Look Motors, Inc., a used car lot in Hyannis, Massachusetts that sold automobiles and offered financing to

---

[1] After oral argument in this case, the Supreme Court decided Cuellar v. United States, 128 S. Ct. 1994 (2008).  The case is pertinent to the limitations issue raised and required further consideration.

customers who could not afford to make large down payments. In connection with this enterprise, he had a business relationship with Steven Queen, a lender.

On July 9, 1997, Queen traveled to Florida and removed a large amount of cash from his parents' safe deposit box. Queen had told several people of his plans prior to making this trip, claiming that the money was his inheritance. Upton had heard about Queen's trip and its purpose.

Upon returning from Florida on the evening of July 12, 1997, Queen left a suitcase containing $900,000 in cash in the trunk of a car that was parked in the Look Motors parking lot and went to dinner. Upton's daughter saw Queen place the suitcase in the trunk of the car. She told Upton and his girlfriend of twenty years, Lynn Alberico, about the suitcase. While Queen was at dinner, Upton and Alberico removed the suitcase from the car. When Queen returned to Look Motors and discovered that the suitcase was missing, he accused Upton of stealing the money. Upton denied the accusation and told Queen to leave. Distraught, Queen went to the apartment of a friend and told her that the money he had taken from his parents was gone.

Queen accused Upton of stealing the money on several occasions, in public confrontations. Upton did not admit to Queen that he had taken the money. During the fall of 1997, however, Upton did admit to an acquaintance that he had stolen a suitcase

with more than $900,000 in cash from Queen. In 1999, Alberico made the same admission to her best friend.

On August 19, 1997, a month after the theft, Upton signed a purchase and sale agreement to buy the property located at 89 Iyanough Road in Hyannis, Massachusetts for $120,000. He made a $12,000 down payment by check; that check was returned for insufficient funds, and Upton replaced it with $12,000 in cash. Upton paid the $108,000 balance of the purchase price with thirteen cashier's checks.

The cashier's checks had been acquired in several stages, over the span of three days. Upton's brother, two friends, and a Look Motors employee assisted Upton and Alberico. Upton provided cash to these four people. Then, each person deposited the cash into his or her personal bank account to purchase one or more cashier's checks. Most of the deposits and checks were for sums less than $10,000 and involved visits to multiple bank branches or multiple visits to the same branch, in order to avoid federal reporting requirements.[2] The checks variously were made out to Upton or to Alberico.

Alberico took title to the property in the name of "AU Trust." That trust, created on the day of the closing, August 29, 1997, bears Alberico's and Upton's initials. Also on the day of

_____

[2] Pursuant to 31 U.S.C. § 5313(a) and 31 C.F.R. § 103.22, domestic financial institutions are required to report currency transactions involving more than $10,000 to the Internal Revenue Service.

the closing, Alberico granted a sham mortgage on the property to "Bostonians Trust of Florida," which did not then even exist. The property was then rented out for $1,000 per month.

The 89 Iyanough Road property was sold on January 5, 1999, for $202,000. On January 6, the real estate attorney wrote separate checks to Upton and Alberico for $39,850 each, and, less than a week later, purchased bank checks made out to Upton and Alberico for $52,948.21 each. Bank records indicate that these checks were deposited into the accounts of Look Motors and Alberico, respectively, in January 1999.

Upton eventually filed his 1997 federal income tax return in July 2000, reporting a total income of $14,165. At the same time, he also filed returns for 1994, 1995, and 1996. All of his returns were prepared by his accountant, based on information provided by Upton. The 1997 return was false in that it did not disclose any portion of the $900,000 stolen from Queen, nor did it disclose any portion of the rental income from 89 Iyanough Road for the partial year 1997. Alberico's tax return for 1997, filed in August 1998, also neglected to report any portion of the stolen money or the rental income. Upton did not file a return for 1998. Alberico filed a false return for 1998 in October 1999, again failing to report rental income. Neither Upton nor Alberico filed a tax return for 1999, the year in which each earned a substantial capital gain from the sale of the property.

### B. Procedural History

In August 2002, a grand jury indicted Upton and Alberico for money laundering and for structuring financial transactions to evade reporting requirements, as well as for conspiracy to engage in such structuring. On May 12, 2004, a superseding indictment added counts of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B), (h) and 1957(a); filing a materially false income tax return for the year 1997, in violation of 26 U.S.C. § 7206(1); and failing to file an income tax return for the year 1999, in violation of 26 U.S.C. § 7203.

The general five-year statute of limitations, 18 U.S.C. § 3282, applies to prosecutions for violations of the money laundering and structuring statutes. For reasons not material to this appeal, the filing of the superseding indictment established May 12, 2004 as the relevant date for statute of limitations purposes. Prosecution for alleged crimes committed prior to May 12, 1999 was thus barred by the statute of limitations. Accordingly, the district court dismissed the counts carried over from the original indictment alleging money laundering, structuring and conspiracy to engage in structuring. Upton, 339 F. Supp. 2d at 196. Upton went to trial on the remaining charges of conspiracy to commit money laundering and the two tax violations.[3]

---

[3] Upton was tried in October 2004. Alberico's motion to sever had been granted previously; she was tried separately in July 2005.

During the charge conference, Upton did not request a jury instruction on a statute of limitations defense to the conspiracy count. The next day, however, at the completion of the government's case in chief, he did request such an instruction. The trial judge denied this request on the basis that Upton had waived the request by failing to raise it at the charge conference. At the completion of the government's case, Upton moved unsuccessfully for judgment of acquittal on the basis that the money laundering conspiracy charge was time-barred. After the jury had been instructed at the close of the evidence, Upton objected to the denial of his request for a statute of limitations instruction. The court again ruled that Upton had waived his right to a jury instruction on the statute of limitations because he did not raise it at the charge conference.

The jury found Upton guilty on each of the three counts: conspiracy to commit money laundering, filing a false tax return, and failure to file a tax return. Following the verdict, the district court denied Upton's renewed motion for judgment of acquittal, United States v. Upton, 352 F. Supp. 2d 92, 100 (D. Mass. 2005), and sentenced him to 162 months' imprisonment.

**II.**

Upton appeals only his conviction for conspiracy to commit money laundering. He does not challenge his tax convictions. As to the conspiracy conviction, he claims that the

-7-

district court erred in not instructing the jury on the statute of limitations; erred in denying his motion for acquittal on statute of limitations grounds; and abused its discretion in admitting a statement as an excited utterance.

### A.  Jury Instruction on Statute of Limitations

Upton contends that the district court erred by failing to instruct the jury on the statute of limitations applicable to the money laundering conspiracy.  He argues that he has preserved his objection to the court's failure to so instruct, and therefore that harmless error is the appropriate standard of review.  While he acknowledges that he failed to request a written instruction at the charge conference, Upton presses the fact that he raised his objection after the charge conference but before the jury was instructed, and again after the instructions were delivered to the jury.  Beyond this, he asserts that even if he has not preserved his objection, the court's failure to give the instruction was plainly erroneous.  See United States v. Thurston, 358 F.3d 51 (1st Cir. 2004), vacated on other grounds.

The appellant is not entitled to relief on this ground. First, the claim of error is unpreserved.  The requirements for requesting a jury instruction are clear.  Fed. R. Crim. P. 30(a) provides as follows:

> Any party may request in writing that the court instruct the jury on the law as specified in the request.  The request must be

> made at the close of evidence *or at any time*
> *that the court reasonably sets*.

(emphasis added). Upton concedes that he did not submit in writing a request for an instruction on the statute of limitations; indeed, he acknowledges that he withheld the request for a jury instruction at the charge conference as part of his trial strategy. As he did not meet the requirements for requesting a jury instruction, his later objections to the jury instructions were deemed waived by the trial judge.

That brings us to the question of how to treat the unpreserved jury instruction issue. In United States v. Muñoz-Franco, 487 F.3d 25, 54 (1st Cir. 2007), we held that the failure to request a jury instruction constitutes waiver. The defendants in Muñoz-Franco claimed that the district court erred in not instructing the jury on the applicable statute of limitations, but they had not raised that issue at any time prior to or during trial, including in their post-trial Rule 29(a) motion. We held that their claim was waived and thus not reviewable on appeal.

Pointing to Thurston, Upton argues that plain error review is appropriate in this case. 358 F.3d at 63. It is not necessary, however, to resolve any potential conflict between Muñoz-Franco and Thurston here. Waiver is the "*intentional* relinquishment or abandonment of a known right." United States v. Olano, 507 U.S. 725, 733 (citation omitted) (emphasis added). The right to a jury instruction can be waived by not requesting the

instruction, or not objecting at the proper time. Fed. R. Crim. P. 30(a), (d). Upton deliberately chose not to request a statute of limitations jury instruction at the charge conference as a matter of trial strategy.[4] The informed decision to decline to exercise the right to request a specific jury instruction is a straightforward example of an "intentional relinquishment" subject to waiver.

Even were we to consider this an instance of forfeiture and review the failure to instruct the jury on the statute of limitations for plain error, we would conclude that there was no plain error. Under the plain error standard, Upton must show that "the trial court committed an error, that the error was 'plain,' and that the error affected the substantial rights of the appellant." United States v. Colon-Nales, 464 F.3d 21, 25 (1st Cir. 2006) (citing Olano, 507 U.S. at 732). Further, error is to be corrected only if it "seriously affects the fairness, integrity

_____

[4] Upton points out that a defendant may face a difficult decision when a charge conference is held before the close of the government's case: raising a defense at that point might alert the government to a weakness in its case and encourage the government to seek additional evidence. Nevertheless, the district court is vested with the authority to manage trials, United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995), including setting a time for the charge conference that parties must adhere to or face the consequences. Here, the charge conference was the day before the government closed the evidence in its case. The timing of the conference was entirely reasonable, and we need not explore application of the rule to situations presenting an extreme gap in timing between the conference and the close of the evidence.

or public reputation of judicial proceedings." <u>Olano</u>, 507 U.S. at 736 (internal citation and quotation marks omitted).

The trial court did not commit plain error in declining to instruct the jury on the statute of limitations. Rule 30(a) is clear, and Upton failed to meet its strictures. The district judge acted within her discretion to deny Upton's requested instruction because the request was untimely.

## B.  Motion for Acquittal on Statute of Limitations

Presented as a challenge to the sufficiency of the evidence, Upton argues that the district court should have granted his motion for acquittal on the conspiracy count because the statute of limitations bars his conviction. The essence of this sufficiency claim is that there was no evidence that the conspiracy continued to a time that was within five years of the May 12, 2004 superseding indictment. Upton argues that the money laundering objective of the conspiracy was achieved no later than when the conspirators sold the Iyanough Road property in January 1999. His failure to file a return for 1999 and his July 2000 filing of a false tax return for 1997 were, he says, at most unilateral acts intended to cover up the conspiracy after its termination. Relying on <u>Grunewald</u> v. <u>United States</u>, 353 U.S. 391 (1957), Upton argues that the tax violations must be viewed as no more than attempts at covering up a completed conspiracy. As such, under <u>Grunewald</u> they cannot constitute acts in furtherance of the conspiracy.

-11-

The government counters that Grunewald does not bar this prosecution. Rather, because the indictment charged a conspiracy the main objective of which was concealment, Grunewald's limiting principle has no applicability to this case.

**1.**

We review de novo the denial of a motion for judgment of acquittal based on the insufficiency of the evidence. United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006). A motion for judgment of acquittal is only granted if "the evidence and all reasonable inferences to be drawn from the evidence, both taken in the light most favorable to the government, are insufficient for a rational factfinder to conclude that the prosecution has proven, beyond a reasonable doubt, each of the elements of the offense." United States v. Pimental, 380 F.3d 575, 583 (1st Cir. 2004).

To determine whether Upton's motion for acquittal based on the statute of limitations should have been granted, we look backward from the date of the superseding indictment and assess whether the evidence, taken in the light most hospitable to the verdict, was such that the jury could reasonably have concluded that the conspiracy did not end until May 12, 1999 or later. See United States v. Walsh, 928 F.2d 7, 11-12 (1st Cir. 1991). The question boils down to whether the jury could have supportably found that either or both of the tax offenses that Upton committed in 2000 were part of the conspiracy, and the wrinkle is Upton's

-12-

assertion that Grunewald requires us to view the tax violations as acts of cover-up beyond the scope of the conspiracy.

A conspiracy endures as long as the co-conspirators endeavor to attain the "central criminal purposes" of the conspiracy. Grunewald, 353 U.S. at 401. In this case, the indictment charged that Upton and Alberico conspired to violate 18 U.S.C. §§ 1956(a)(1)(B) and 1957(a). Section 1956(a)(1)(B) prohibits engaging in financial transactions involving the proceeds of unlawful activities:

> knowing that the transaction is designed in whole or in part--
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ...

18 U.S.C. § 1956(a)(1)(B) (emphasis supplied). The focus of the prohibition is thus trained on the design to conceal or disguise. The concealment feature distinguishes § 1956(a)(1)(B) from § 1957(a). Section 1957(a) prohibits monetary transactions in criminally derived property, but does not contain an element of concealment or disguise.

The Supreme Court has recently examined language in § 1956(a)(2) that is identical to the language of the section at issue in this case, § 1956(a)(1)(B)(i). In Cuellar, 128 S. Ct. 1994, the Court considered whether certain conduct violated § 1956(a)(2)'s proscription against "transportation" of proceeds with knowledge that the transportation was designed to conceal or

-13-

disguise the nature, location, source, ownership or control of the proceeds. The Court emphasized that in the phrase "designed ... to conceal or disguise," "'design' means purpose or plan"; *i.e.*, the intended aim of the transportation. 128 S. Ct. at 2003. As the pertinent language of § 1956(a)(1)(B) is identical to that of § 1956(a)(2)(B), we conclude that Congress's use of "designed ... to conceal or disguise" in (a)(1)(B) likewise requires the government to prove that there was a purpose or plan to conceal or disguise. See Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 562 (1995) ("The normal rule of statutory construction [is] that identical words used in different parts of the same Act are intended to have the same meaning."); see also Finnegan v. Leu, 456 U.S. 431, 438 n.9 (1982) (noting that "if Congress had intended identical language to have substantially different meanings in different sections of the same enactment it would have manifested its intention in some concrete fashion.").

The conspiracy count in the indictment explicitly invoked the concealment money laundering prohibition of 18 U.S.C. §§ 1956(a)(1)(B), charging Upton with the intent to conceal material characteristics of the stolen money. The indictment alleged, as the "manner and means" of carrying out the conspiracy, that the defendants used the stolen monies to make the multi-layered purchase of 89 Iyanough Road in August of 1997; that Upton commingled additional theft proceeds with business receipts of Look

-14-

Motors on more than twenty occasions during the remainder of 1997; that Alberico filed a false tax return for 1997 in 1998 that did not disclose the theft income or her rental income from the Iyanough road property; and that:

> "It was part of the conspiracy that [defendants] attempted to conceal or disguise the nature, location, source, ownership, or control of the illegal cash proceeds by failing to file income tax returns, or declare a capital gain from the sale of the commercial property, for the tax year 1999 [and Upton attempted to conceal or disguise] by filing a materially false federal income tax return . . . that failed to declare the receipt of the illegal income or the rental income from the property in 1997."

The indictment thus put Upton on notice, at a minimum, that his concealment of the capital gain from the sale of 89 Iyanough Road was part and parcel of the alleged means of carrying out the charged conspiracy.[5] To sustain its burden of proof, the government had to establish that Upton conspired to engage in transactions with the intended aim of concealing or disguising certain attributes of the funds involved. And to avoid the statute of limitations bar, it also had to prove that one of the tax offenses was in furtherance of the central objective of the conspiracy.

---

[5] The indictment did not expressly allege the sale of the Iyanough Road property in January 1999 as a money laundering transaction, but as we have noted, the indictment did allege that the concealment of capital gain on the sale was part of the conspiracy. In any event, Upton does not make any claim of variance and does not contest that the sale was part of the conspiratorial object.

-15-

Determining the contours of the conspiracy ordinarily is a factual matter entrusted largely to the jury.  United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993).  Consistent with the allegations in the indictment, the government introduced evidence that Upton and Alberico purchased the 89 Iyanough Road property in August 1997 and sold it in January 1999.  The pair converted cash into cashier's checks to finance the initial purchase of the property, set up the sham mortgage, and took title in the name of "AU Trust."  Upton commingled additional theft proceeds with business income.  Alberico filed a false 1997 tax return, omitting the theft proceeds and rental income.  Neither Upton nor Alberico filed tax returns for 1999 -- the year in which they were required to report a capital gain on the sale.

From this evidence the jury reasonably could have found that Upton's failure to file the 1999 return was in furtherance of the central objective of the conspiracy.  Specifically, the jury supportably could have concluded that the failure to file his 1999 return in the ordinary course facilitated the concealment aim of the money laundering transactions.  That act of omission may have had special significance to the jury, because in his 1999 return Upton was required to disclose not only any rental receipts but also the capital gain he realized on the sale of the property.  The jury may have also found it significant that Alberico, too, did not file a return for 1999, contrary to her practice in previous years.

The capital gains disclosures they were required to make easily could have unraveled the entire money-laundering scheme, not only subjecting them to prosecution, but also resulting in the forfeiture of the proceeds. See 18 U.S.C. § 981(a). Avoiding such an outcome, whereby their use of the proceeds would be thwarted, was a primary goal of the concealment money laundering conspiracy, or so the jury could have found.[6]

**2.**

In the face of this evidence, Upton argues that the Grunewald imposes a limitation on the ability of subsequent acts of

---

[6] The government says that Upton's filing in 2000 of a false 1997 return was also an act in furtherance of the conspiracy. It may have been, although the act occurred more than two years after Upton would have been expected to file a return, and almost two years after his coconspirator Alberico similarly filed a false return. We need not definitively resolve whether that Upton's false filing was in furtherance of the conspiracy. The evidence of the conspirators' parallel failures to file 1999 tax returns was sufficient for the jury to conclude that the conspiracy lasted at least until May 12, 1999. But that does not by any stretch render Upton's 2000 filing irrelevant. At a minimum, the fact of the false filing was admissible to show, and was strong evidence of, Upton's knowledge that the 1997 purchase was designed to conceal characteristics of the unlawful proceeds. In addition, coming as it did in the same time frame as Upton's failure to file a tax return for 1999, his guilty knowledge associated with the June 2000 false filing solidifies the inference that the reason for the failure to file was in fact to prevent discovery of the money laundering conspiracy. The 1997 returns filed by both conspirators were false in that they did not disclose the receipt of the stolen funds. Pointedly, they also failed to disclose the rental income from the Iyanough Road property, further cementing the inference that ownership of that property was part of a design to disguise or conceal.

concealment to extend the life of a conspiracy.[7]  At bottom, as we have noted, the argument is that acts that constitute an attempt to cover up a completed crime do not extend the duration of the conspiracy.  See Grunewald, 353 U.S. at 401 (it is not enough that the defendants "took care to cover up their crime in order to escape detection and punishment").  According to Upton, his failure to file a 1999 tax return and his July 2000 filing of a false 1997 tax return were, at most, attempts to cover up completed financial transactions, namely, the buying and selling of the Iyanough Road property in August 1997 and January 1999.  Thus, he maintains, under Grunewald the acts of concealment represented by the two tax offenses could not extend the life of the conspiracy.  In support of this argument, Upton cites United States v. LaSpina, 299 F.3d 165, 176 (2d Cir. 2002), for the proposition that a conspiracy with an economic transaction as its objective lasts only until the "anticipated economic benefits" of that transaction are received.  Id.

---

[7] In Grunewald, decided under the general conspiracy statute, 18 U.S.C. § 371, the defendants had been charged with conspiracy in connection with a scheme to obtain "no prosecution" rulings by bribing an IRS official in two discrete tax cases. Based primarily on a concern that the statute of limitations otherwise would be open-ended, the Court concluded that later acts of cover-up did not extend the duration of the conspiracy.  Subsequently, in Forman v. United States, the Court held a conspiracy to have continued into the relevant limitations period, where the indictment alleged that the conspiracy included the acts of concealment, and where the concealment was necessary for the successful completion of the scheme.  361 U.S. 416, 423-24 (1960).

-18-

If covering up a completed conspiracy to violate 18 U.S.C. § 1957(a), by engaging in monetary transactions in criminally derived property, were all that the two tax offenses accomplished, the argument might have merit. Here, however, as we have noted, Upton was also charged with conspiring to violate § 1956(a)(1)(B) by engaging in financial transactions designed to conceal or disguise certain characteristics of the proceeds of unlawful activity. The objective of the conspiracy was more than the specific monetary transactions of buying and selling 89 Iyanough Road. The objective was to engage in concealment money laundering in order to obscure the illicit source of the funds and the conspirators' continued control of the proceeds. Accordingly, Upton's argument fails to gain traction.[8]

To be sure, in some cases the crime of concealment money laundering may be completed at the time the transaction itself is consummated. In this case, for example, there was a wealth of evidence that the purchase of the Iyanough Road property in 1997 constituted concealment money laundering. But that the evidence might have shown that the 1997 purchase of property constituted concealment money laundering does not mean that the conspiracy to

---

[8] Upton's citation to LaSpina is inapposite. The conspiracy in LaSpina differed materially from the conspiracy in this case. LaSpina involved a conspiracy whose purpose was to engage in monetary transactions in criminally derived property, in violation of 18 U.S.C. § 1957(a). The reasoning in LaSpina thus applies to conspiracies without an element of concealment.

-19-

commit concealment money laundering ceased at that time or, for that matter, with the sale of the property in 1999.[9]

Where, as we have established is the case here, the substantive crime that is the object of the conspiracy has the intent to conceal as an element, the success of the conspiracy itself may depend on further concealment. Consequently, additional acts of concealment that facilitate the central aim of the conspiracy are in furtherance of the conspiracy. See, e.g., United States v. Goldberg, 105 F.3d 770, 774 (1997) (acts of tax evasion were "integral and self-evident part of" fraud conspiracy charged under 18 U.S.C. § 371); United States v. Mann, 161 F.3d 840, 859 (5th Cir. 1998) (acts designed to frustrate regulatory oversight were "central" to conspiracy involving fraud within savings and loan institution); United States v. Esacove, 943 F.2d 3, 5 (5th Cir. 1991) (acts designed to protect money laundering conspiracy against government investigation held "necessary" part of conspiracy). And, as noted above, the jury was entitled to infer that the conspirators' parallel failures to file tax returns for

---

[9]  In Grunewald, the court observed that subsequent acts of concealment may well facilitate the success of the substantive crime and thus be in furtherance of the conspiracy, as when a car thief repaints the stolen vehicle. 353 U.S. at 405.  The purpose of concealment money laundering is to make proceeds appear legitimate, especially to the government.  Preventing the authorities from discovering the illicit nature of the proceeds, by concealing the existence or financial impact of the money laundering transactions, is as much a part of the ongoing conspiracy to launder money as repainting the car is a part of a theft conspiracy.

-20-

1999 were part of an ongoing plan to engage in concealment money laundering, rather than merely being later attempts to cover up a completed crime. See United States v. Dazey, 403 F.3d 1147, 1159 (10th Cir. 2005) ("[T]he jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action.").

**3.**

Upton presents another argument. Even assuming that he engaged in acts of concealment that could be considered to be in furtherance of the main objectives of the conspiracy, no conspiracy could have existed in this case because he and Alberico never expressly agreed to engage in acts of concealment. The Court's decision in Grunewald, he posits, requires that the government present proof of defendant's express agreement to conceal. See United States v. Twitty, 72 F.3d 228, 234 (1st Cir. 1999). The government, Upton contends, failed to present such evidence. In fact, Upton argues that the record evidence actually supports his contention that no such express agreement existed and that, as a result, any acts of concealment were undertaken unilaterally. This is because the record indicates that, by the summer of 1999, he and Alberico were estranged.

Upton's argument misses the point. In Grunewald, the Court drew a distinction between "acts of concealment done in furtherance of the main objectives of the conspiracy," and "acts of

-21-

concealment done after these central objectives have been attained for the purposes of covering up after the crime." 353 U.S. at 405. Where the latter is involved, the government must present some proof of an express original agreement to engage in the acts of concealment. See Twitty, 72 F.3d at 234. However, nothing in the case law imposes a requirement that conspirators expressly agree to engage in acts of concealment where those acts are done in furtherance of the main objectives of the conspiracy.[10] Rather, the acts of concealment committed by one co-conspirator need only have been "foreseeable" to the other co-conspirator. See United States v. Hansen, 434 F.3d 92, 103 (1st Cir. 2006); United States v. Pinillos-Prieto, 419 F.3d 61, 69 (1st Cir 2005).

Here, as established above, a reasonable jury could conclude that the acts of concealment in this case, specifically the failure of Upton and Alberico to file 1999 tax returns, were done in furtherance of the main objectives of the conspiracy. And, moreover, these acts would have plainly been foreseeable to both conspirators. Not filing returns was an "integral and self-evident part of" the conspiracy -- had either Upton or Alberico not hidden the proceeds of the house sale, this would have

---

[10] In fact, cases like Mann, 161 F.3d at 859 and Davis, 623 F.2d at 192 indicate that no such requirement exists.

defeated the primary purpose of the conspiracy.  Goldberg, 105 F.3d at 774.[11]

## 4.

In his final attempt at excluding the tax offenses from consideration, Upton suggests that his estrangement from Alberico in the summer of 1999, alluded to above, amounted to a withdrawal from the conspiracy.  This argument is waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  In any event, the standard for recognizing a conspirator's withdrawal from a conspiracy is exacting.  Even were this argument not waived, Upton cannot demonstrate his withdrawal from the conspiracy.  See United States v. Dunn, 758 F.2d 30, 38 (1st Cir. 1985) ("[A] conspirator must act affirmatively to either defeat or disavow the purpose of the

_____

[11] Although it is unnecessary to our analysis, we note further that a reasonable jury could have concluded that Upton and Alberico had expressly agreed to engage in acts of concealment.  Upton and Alberico acted in tandem when they both failed to file returns in 1999.  This concerted activity is circumstantial evidence that an express agreement to conceal was in place.

Of course, Upton and Alberico did not act in complete concert at all times.  For example, in 1998 Alberico filed a false return for 1997 omitting the stolen Queen money, whereas Upton waited until 2000 to file a false return for 1997.  But that other evidence conceivably supports the absence of an express agreement to conceal is not dispositive in this sufficiency of the evidence case.  See United States v. Ortiz, 447 F.3d 28, 34 (1st Cir. 2006) ("[C]ompeting inferences are not enough to disturb a jury's verdict").

conspiracy"; mere disagreement with co-conspirators is insufficient to constitute withdrawal.).[12]

## C. Hearsay Evidence

Upton argues that the district court erred in admitting as an excited utterance Queen's hearsay statement to his friend Janet Hoell that "the money was gone" on the night of the theft of the suitcase. Fed. R. Evid. 803(2) creates an exception to the rule against hearsay for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Upton contends that because six hours elapsed between the startling event -- the disappearance of the suitcase full of money -- and Queen's statement to Hoell, the statement could not have been made while Queen was "under the stress of excitement" of the loss of the money. Fed. R. Evid. 803(2).

---

[12] Upton does present an additional argument that merits only summary treatment. He contends that, for statute of limitation purposes, the indictment in this case barred consideration of his tax crimes because it failed to: (1) allege that he and Alberico agreed to commit those tax crimes and (2) charge him with conspiring to commit money laundering with the intent to evade taxes or file a false return in violation of 18 U.S.C. § 1956(a)(1)(A)(ii). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Cianci, 378 F.3d 71, 81 (1st Cir. 2004) (citation and internal quotations omitted). A review of the indictment in this case makes plain that the indictment's language was sufficient to put Upton on notice of the conspiracy charge against him.

-24-

We review the admission of evidence after an objection for an abuse of discretion.  See United States v. Garcia, 452 F.3d 36, 38 (1st Cir. 2006).  We will only vacate a jury verdict if an improperly admitted statement was not harmless -- that is, if its admission "'likely affected the outcome of trial.'"  United States v. Castellini, 392 F.3d 35, 52 (1st Cir. 2004) (quoting United States v. Torres-Galindo, 206 F.3d 136, 141 (1st Cir. 2000)).

If the admission of the statement was error at all, which we needn't decide, it was harmless for two reasons.  First, the statement itself likely did little to influence the jury.  Conspiracy to commit concealment money laundering involves an agreement to conceal the nature of proceeds that were unlawfully obtained.  Here, in order to prove the element that the proceeds had been illegally obtained, the government had to show that Upton stole the money that he subsequently laundered.  Queen's statement does not demonstrate that the money was even stolen, much less that Upton was the one who stole it.  While Queen's statement does provide support for the idea that the money disappeared from the trunk of the car during a specific time frame, it does not implicate Upton.

Second, the government presented plenty of evidence that Upton did in fact steal the money.  Upton's friend Phidias Dantos testified that Queen accused Upton of stealing the money shortly after the theft occurred.  More significantly, Colleen Otto

testified that Alberico told her that Alberico and Upton had taken the money, and Edwin Jones testified that Upton revealed to him that he had stolen the money. Look Motors's bookkeeper, Lucy Webb, testified that Upton declined to tell her where he got the money to purchase 89 Iyanough Road, saying that he wanted to "maintain her innocence." And the additional evidence of Upton's money laundering activities provided strong support for the inference that he and Alberico had obtained a large sum of money around the time the suitcase was stolen from Queen. If it was anything, Queen's statement was merely icing on the cake.

Upton nevertheless contends that the admission of Queen's statement cannot constitute harmless error. He argues that Queen's statement bolstered the testimony of Otto and Jones, witnesses who he says were in need of bolstering because of their dubious credibility.[13] There are two problems with this argument. First, the bolstering complaint applies only to Otto and Jones. As we have explained, the testimony of Otto and Jones was not the only evidence indicating that Upton stole the money from Queen. Second, in addition to credibility being a matter for the jury to determine, it is doubtful that the credibility of Otto and Jones

_____

[13] Upton challenges Jones's credibility in two aspects: Jones was serving time on drug charges and testified in return for a reduction in his sentence; and, Jones may have been seeking revenge against Upton because Upton tipped off the police to Jones's drug dealing activities several years ago. Upton also challenges Alberico's comments to Otto as potentially motivated by a desire to incriminate Upton following their breakup.

needed bolstering from Queen's statement in any event. Their testimony was supported by other evidence. Otto's testimony that Alberico admitted that she and Upton took the suitcase of money to a hotel was supported by hotel records introduced at trial revealing that Upton rented a hotel room for two people on the night Queen returned from Florida. Otto's further testimony that Alberico said she had spent part of her share of the money during a trip to Italy was corroborated by airline and credit card records showing that Alberico was in Italy during February 1999. Jones testified that in 1997 Upton gave him cash from a "shoebox full of money" and that the money "looked old" and was dated from the 1950s; this description is consistent with the proposition that the money was earned by Queen's father throughout his life and subsequently stored in a safe deposit box.

In short, Queen's statement to Hoell is cumulative of other evidence in the record. Regardless of whether admitting the statement as an excited utterance may have been error, any such error was harmless.

For the reasons expressed above, we uphold Upton's conviction.

**Affirmed**.

-Dissenting Opinion Follows-

-27-

**LIPEZ**, **Circuit Judge**, dissenting in part. The relationship between the concealment at issue in Upton's conspiracy to commit money laundering and the concealment associated with his subsequent tax crimes is complex. The majority misapplies the relevant legal principles and, consequently, wrongly concludes that Upton's failure to file a 1999 tax return was conduct within the scope of the money laundering conspiracy. In so doing, the majority embraces the government's misguided attempt to remedy a statute of limitations problem by stretching the money laundering conspiracy beyond its justifiable limits to include Upton's independent tax crime.

As the majority notes, the district court had dismissed before trial, on statute of limitations grounds, counts alleging money laundering, structuring, and conspiracy to engage in structuring. To salvage its money laundering conspiracy charge, the government sidestepped the Supreme Court's teaching in Grunewald v. United States, 353 U.S. 391 (1957), which – given the evidence presented – bars treating the tax fraud as conduct that furthered the conspiracy. If, as Grunewald requires, Upton's tax evasion were eliminated from the scope of the conspiracy, no act in furtherance of the money laundering scheme would fall within the five-year statute of limitations period – and the jury's guilty verdict on the conspiracy count could not stand. Because the

-28-

majority's decision to uphold the verdict conflicts with the governing precedent, I respectfully dissent.[14]

## I.

In <u>Grunewald</u>, the Supreme Court drew a distinction between acts of concealment that furthered a charged conspiracy and subsequent acts of concealment done "for the purpose only of covering up after the crime." <u>Id.</u> at 405. If the acts at issue were of the latter type – i.e., they did not further "the main criminal objectives of the conspiracy" – the concealment would not extend the duration of the conspiracy for purposes of the statute of limitations. <u>Id.</u>; <u>see</u> <u>also</u> <u>United States</u> v. <u>Twitty</u>, 72 F.3d 228, 233 (1st Cir. 1995).

That distinction, the Court explained, was governed by "important considerations of policy" that hearkened back to prior cases "repeatedly warn[ing] that we will view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." <u>Grunewald</u>, 353 U.S. at 404. Routinely viewing concealment efforts as part of a conspiracy would "wipe out the statute of limitations in conspiracy cases" and "result in a great widening of the scope of conspiracy prosecutions" because "every conspiracy will inevitably be followed by actions taken to

---

[14] My objections to the majority's reasoning also apply to its decision in the separate appeal of Upton's co-defendant, Alberico, who also challenged her conviction for conspiracy to commit money laundering on statute of limitations grounds.

-29-

cover the conspirators' traces." Grunewald, 353 U.S. at 402. Hence, the Court rejected "the proposition that the duration of a conspiracy can be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." Id. at 405.

Thus, if Upton's tax evasion were conduct designed to cover up the money laundering conspiracy after the crime had been accomplished, rather than conduct undertaken to further the conspiracy's central criminal purpose – laundering the stolen money – the money laundering conspiracy charge would be time-barred. Two possible theories, however, could support a conclusion that the failure to file a 1999 tax return furthered the charged conspiracy for purposes of the statute of limitations. First, if the evidence showed that the conspiracy embraced "an express original agreement among the conspirators to continue to act in concert in order to cover up" the crime, those acts of concealment could "properly be regarded as in furtherance of the conspiracy." Id. at 404, 397. In such instances, the cover-up would be not only foreseeable – as it would be with all crimes – but the explicit objective of "a subsidiary conspiracy to conceal." Id. at 402.

Second, the tax fraud would be within the scope of the money laundering conspiracy if it could be viewed as an act of

concealment done in furtherance of the main criminal objective of the conspiracy. In Grunewald, the defendants had fraudulently obtained "no prosecution" rulings from the Bureau of Internal Revenue on behalf of two companies seeking to avoid tax evasion charges, and the defendants later took steps to conceal their fraudulent activity. Id. at 395-96. The Supreme Court observed that the "no prosecution" rulings obtained in 1948 and 1949 had been the main objective of the conspiracy presented to the jury, and the subsequent efforts to conceal the irregularities – the conduct occurring within the statute of limitations period – could only have been for the purpose of avoiding apprehension, rather than to further the conspiracy's already completed objective. Id. at 405-06. The Court acknowledged, however, that some acts of concealment are so closely linked in time and purpose to the accomplishment of the conspiracy that they are "in furtherance of the objectives of the conspiracy itself." Id. at 405. The Court cited the concealment of kidnappers who hide while awaiting ransom and the repainting of a stolen car as instances in which "the successful accomplishment of the crime necessitates concealment." Id.

The majority premises its analysis primarily on the second theory, concluding that "[n]ot filing returns was an 'integral and self-evident part of' the conspiracy," but it asserts in a footnote that a reasonable jury could have concluded as well

-31-

that Upton and Alberico had expressly agreed to engage in acts of concealment. I therefore consider both theories, looking first at the possibility of an express agreement to conceal.

## II.

In asserting that the conspiracy in this case embraced the acts of concealment in the aftermath of the money laundering transactions, the majority emphasizes that, pursuant to the money laundering statute, the indictment charged Upton with conspiring "to conceal or disguise," inter alia, the source and control of the stolen $900,000. See 18 U.S.C. § 1956(a)(1)(B).[15] The majority concludes that, because of this concealment language, "[t]he objective of the conspiracy was more than the specific monetary transactions of buying and selling 89 Iyanough Road," but included the purpose "to obscure the illicit source of the funds and the conspirators' continued control of the proceeds." It reasons that, because the money laundering crime that was the objective of the

---

[15] That provision states, in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts . . . such a financial transaction which in fact involves the proceeds of specified unlawful activity--
    (B) knowing that the transaction is designed in whole or in part--
    (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .
shall be sentenced to a fine . . . or imprisonment . . . .

-32-

conspiracy included a concealment element, the tax fraud was within the conspiracy's scope.

The concealment element in the money laundering statute does not, however, bring within the scope of the money laundering conspiracy all conduct undertaken by the defendants to conceal the theft of the $900,000. The concealment element of section 1956(a)(1)(B) goes to the defendant's state-of-mind <u>when engaging in the prohibited transactions</u>. The statute makes unlawful the conduct of a financial transaction "knowing that the transaction is designed in whole or in part . . . to conceal or disguise" the origin or control of unlawfully obtained property. In other words, the jury in this case had to find that Upton conspired to commit money laundering transactions that were undertaken for the purpose of concealing the crime from which the laundered proceeds were derived (here, the theft of the $900,000). The statutory state-of-mind requirement does not, however, transform subsequent acts of concealment that do not involve financial transactions – whether designed to hide the money laundering activity or, like the money laundering itself, to hide the original theft – into conduct that is within the money laundering conspiracy.

Under <u>Grunewald</u>, efforts to conceal the money laundering conspiracy after the conspiracy's primary aim (the deceptive financial transactions) has been achieved may be included within the scope of the conspiracy only if the evidence permits the jury

-33-

to find that the defendants' "*original* agreement" explicitly included a subsidiary objective to cover up their crime. See Grunewald, 353 U.S. at 404 (emphasis added). In other words, there must be some evidence of an agreement between the defendants, entered into before they commit the crime that is the object of the conspiracy, to continue to act jointly to cover up their unlawful activity. Only where there is such a pre-crime agreement will acts of covering up after the crime reveal "more than that the conspirators do not wish to be apprehended – a concomitant . . . of every crime since Cain attempted to conceal the murder of Abel from the Lord." Id. at 406.

As in Grunewald, "[t]here is not a shred of direct evidence in this record to show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." Id. at 404. Nor does the fact that both Upton and Alberico failed to file 1999 tax returns reporting the gain earned from the stolen funds constitute indirect evidence of such an agreement to conceal. The Supreme Court in Grunewald unequivocally held that such post-crime evidence was insufficient to show the required pre-crime agreement:

> [A] conspiracy to conceal is being implied [by the government] from elements which will be present in virtually every conspiracy case, that is, secrecy plus overt acts of concealment. . . .

> Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators.

Id. at 404, 402; see also SEC v. Papa, No. 08-1172, Slip op. at 11-12 (1st Cir. Feb. 6, 2009) (noting that "an agreement to conceal after the fact could be viewed as inherent in a conspiracy or any wrongful fraudulent scheme[,] but then all covert joint wrongdoing would be a permanently continuing offense . . . an approach that the Supreme Court has rejected"); United States v. Goldberg, 105 F.3d 770, 773 (1st Cir. 1997) (holding that "mere collateral effects of jointly agreed-to activity, even if generally foreseeable, are not mechanically to be treated as an object of the conspiracy"); id. at 774 (noting that, in the case of a band of bank robbers, "[a]ll know that the agreed-upon robbery will generate 'income' that none of the robbers will report[, y]et it would be straining to describe interference with the IRS as a purpose or object of the conspiracy"). The inference of an original agreement to conceal is particularly unwarranted here given that, as the majority acknowledges, Upton and Alberico did not consistently act in tandem following the money laundering. Alberico filed a false return for 1997 that omitted the stolen $900,000, while Upton filed his false return for that year in 2000.

In sum, "the essential missing element is a showing that the act [of concealment] was done in furtherance of a prior

-35-

criminal agreement among the conspirators." <u>Grunewald</u>, 353 U.S. at 404 n.16.  Because there is no evidence permitting the jury to find that Upton and Alberico entered into an "express original agreement" to cover up their money laundering activity, the tax fraud may not be considered within the scope of the conspiracy on that basis.

## III.

Nor can the failure to file the 1999 tax return be viewed as an act of concealment done in furtherance of the main objective of the money laundering conspiracy.  Although tax evasion is a foreseeable consequence of virtually every financial crime, <u>Goldberg</u>, 105 F.3d at 773, it is not inevitably within the scope of every conspiracy to commit such crimes.  The question is whether, consistent with the second theory permitted by <u>Grunewald</u>, the jury could find that "the successful accomplishment of the crime necessitate[d]" that act of concealment.[16]  <u>Id.</u> at 405.

---

[16] Count Four of the indictment alleged the following tax-related conduct by Upton as part of the money laundering conspiracy:

> 5. It was a part of the conspiracy that defendants George L. Upton and Lynn M. Alberico attempted to conceal or disguise the nature, location, source, ownership, or control of the illegal cash proceeds by failing to file income tax returns, or declare a capital gain from the sale of the commercial property, for the tax year 1999.
> 6.  It was a part of the conspiracy that George L. Upton attempted to conceal or disguise the nature, location, source, ownership, or control of the illegal cash proceeds by filing a materially false federal income tax return in or about July 2000 that failed to declare the receipt of the illegal income or the rental income

-36-

The majority states that, because the purpose of the money laundering conspiracy was to conceal the Queen theft, "additional acts of concealment that facilitate the central aim of the conspiracy are in furtherance of the conspiracy." The majority asserts that the tax evasion meets this description: "[C]oncealing the existence or financial impact of the money laundering transactions[] is as much a part of the ongoing conspiracy to launder money as repainting the car is a part of a theft conspiracy."

This case does not, however, involve an "ongoing conspiracy" that allegedly was intended to last beyond the set of transactions that laundered the stolen $900,000. Such a continuous conspiracy was described in United States v. Gardiner, 463 F.3d 445, 463 (6th Cir. 2006), where the court discussed crimes with "'no specific terminating event'" – such as a conspiracy to fix court cases or generalized loan-sharking activity – in which mid-conspiracy concealment is necessary for the scheme to continue. See id. (recognizing that, "[i]n conspiracies where a main objective has not been attained or abandoned and concealment is

_____

from the property in 1997.

The government argues that Upton's filing of a false return for 1997 also was an act in furtherance of the conspiracy, although the majority does not rely on that conduct. I would have the same objections to any such reliance as I do for Upton's failure to file the 1999 return.

-37-

essential to success of that objective, attempts to conceal the conspiracy are made in furtherance of the conspiracy") (citation omitted); see also United States v. Esacove, 943 F.2d 3, 5 (5th Cir. 1991) (noting that "'concealment is sometimes a necessary part of a conspiracy'" to "'protect it from those investigative agencies which threatened its continuation'" (quoting United States v. Del Valle, 587 F.2d 699, 704 (5th Cir. 1979))). The money laundering conspiracy charged here, focused as it is on transactions designed to conceal a single crime, ended at a fixed point in time – when those specific transactions were completed. See Papa, slip op. at 12 ("'[T]hough the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one.'" (quoting Fiswick v. United States, 329 U.S. 211, 216 (1946)).

The flaw in the majority's reasoning is further revealed by considering the Supreme Court's illustrative crimes in Grunewald. With its stolen car and kidnaping examples, the Supreme Court was describing acts of concealment that occur – as with "ongoing" conspiracies – in tandem with the criminal conduct that is the object of the charged conspiracy. In such cases, where the concealment occurs before the object of the conspiracy is completed (as with the kidnapers awaiting ransom) or coincident with its completion (as with the new paint job on a stolen car), the concealment is closely related in time to the commission of the crime that is the conspiracy's goal. Such concealment directly

-38-

facilitates the crime's completion and, as such, it is properly viewed as part of the original criminal undertaking rather than as post-conspiracy cover-up.

Indeed, the Court in Grunewald extended its kidnaping example by noting that the concealment addressed by the government's proof at trial in that case was "[m]ore closely analogous to . . . conspiring kidnapers who cover up their traces after the main conspiracy is finally ended – i.e., after they have abandoned the kidnaped person and then take care to escape detection."  353 U.S. at 405.  By confining "necessary" acts of concealment to those that occur contemporaneously with the overt acts that comprise the substantive crime, the Supreme Court's concern in Grunewald – that acts of concealment not be used to indefinitely extend the duration of a conspiracy – does not arise.

Here, too, the concealment relied upon by the government to extend the duration of the conspiracy is more akin to the cover-up conduct of kidnapers who have pocketed their ransom and abandoned their victim.  There is no dispute that the overt acts that were the objective of the charged conspiracy – the financial transactions prohibited by section 1956(a)(1)(B) – had ended, at the latest, with the sale of the Iyanough Road property in January 1999.[17]  The failure to file a tax return more than a year later –

---

[17] Although Upton appears to presume that the money laundering transactions included the house sale, the list of transactions in the indictment concludes with the purchase of the house.

-39-

assuming the usual April 15th deadline – is materially different from either of the Supreme Court's examples of within-the-conspiracy concealment. First, the tax evasion was remote in time from the targeted transactions. Second, the tax conduct did not facilitate those transactions. Upton and Alberico successfully changed the cash into cashiers' checks and purchased the house in 1997, completing the money laundering conduct that was the objective of the charged conspiracy. Their failure to file returns showing the gain from the house protected the scheme after the fact by concealing it, but that function is not enough to bring the tax evasion within the scope of the money laundering conspiracy.

Indeed, that tax evasion is precisely the sort of post-conspiracy concealment that the Court in Grunewald – as a matter of policy – deemed insufficient to extend the statute of limitations. By contrast, a car thief's repainting of the car – and, even more so, the hiding of kidnapers waiting for ransom – is necessary for the successful accomplishment of the crime that is the object of the conspiracy.

The problem with the majority's logic is demonstrable by applying it to a scenario in which Upton and Alberico had sold the Iyanough Road house ten years later, in 2009, and similarly failed to file tax returns reporting their gain. The majority's analysis leads to the conclusion – impermissible under Grunewald – that the money laundering conspiracy would have continued for another

decade, despite the lack of money laundering transactions throughout that period. The majority disclaims such a conclusion in its opinion in Alberico's appeal, noting that "the failure to file [returns for 1999] was within a short time and thus likely to be part of the conspirators' agreement."

The majority offers no principled basis, however, for drawing a distinction between a failure to file a return disclosing gain earned in 1999 and a failure to file a return reporting that same gain earned at a later date. The concealment function performed by the tax evasion is the same in both instances, and I do not see how such concealment can be deemed an essential part of the money laundering conspiracy at the earlier time but not later.[18] Moreover, in both instances the objective of the money laundering conspiracy – the commission of the crime of money laundering – had

_____

[18] Beyond highlighting the flaw in the majority's reasoning, the hypothetical shows the problem in viewing the sale of the Iyanough Road house – as distinguished from its purchase – as part of the money laundering conspiracy. The laundering was accomplished by converting the cash to cashier's checks that were then converted into real estate, from which Upton and Alberico earned rent of $1,000 a month. As Upton points out, if the failure to report down-the-line profits from the laundered money (such as gain from the house sale) is held to be within the scope of the original money laundering conspiracy, the result would be an open-ended statute of limitations – the Supreme Court's concern in Grunewald. See 353 U.S. at 402 ("Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in conspiracy cases . . . ."); see also United States v. Magluta, 418 F.3d 1166, 1180 (11th Cir. 2005) (holding that purchases using laundered proceeds years after the payment that constituted the original laundering could not be considered part of the money laundering conspiracy).

-41-

already been completed. Hence, the timing of the tax evasion does not support the majority's conclusion that it was within the scope of the original money laundering conspiracy. To the contrary, the tax conduct's remoteness from the charged objective of the conspiracy – to launder the $900,000 by means of financial transactions – confirms that it was not necessary to the accomplishment of the conspiracy in the sense required by Grunewald.

**IV.**

The majority's confusion undoubtedly stems in part from its failure to appreciate the critical difference between the conspiracy alleged here and the type of conspiracy charged in Grunewald and other cases on which the majority relies, including Goldberg and United States v. Mann, 161 F.3d 840, 859 (5th Cir. 1998). Those cases involved conspiracies brought under 18 U.S.C. § 371, which criminalizes any conspiracy "to defraud the United States, or any agency thereof in any manner or for any purpose." 18 U.S.C. § 371. Such a conspiracy "can have multiple objects, and any agreed-upon object can be a purpose of the conspiracy and used to define its character." Goldberg, 105 F.3d at 774 (citing Ingram v. United States, 360 U.S. 672, 679-80 (1959)).

Thus, under section 371, a defendant may be charged and found guilty of conspiring to defraud the government by means of tax conduct whose purpose was to conceal earlier illicit activity

that was charged as a separate object of the same conspiracy.  In Mann, for example, the government alleged five separate objects of the single conspiracy charged under section 371 in the indictment's first count, including misuse of bank funds and the filing of false income tax returns.  Mann, 161 F.3d at 847-48.  The court rejected the defendants' Grunewald argument because "[t]he central aim of the conspiracy" – as alleged in the indictment – included a purpose to evade taxes.  Mann, 161 F.3d at 859.

Grunewald also illustrates the potential breadth of conspiracies under section 371.  Although the case was tried on the theory that the defendants' conspiratorial objective was to obtain "no prosecution" rulings for certain taxpayers, the indictment embraced the theory that the conspiracy's central object extended beyond those provisional rulings "to immunize the taxpayers completely from prosecution for tax evasion."  Grunewald, 353 U.S. at 408.  The Supreme Court concluded that, under the limited theory presented to the jury, the acts of concealment following the "no prosecution" rulings could only be viewed as post-conspiracy cover-up to protect the defendants.  Under the broader theory, however, those acts could be viewed as conduct in furtherance of the conspiracy to fully protect the taxpayers from tax liability.  Id. at 409-411.

The Court remanded the case for a new trial because the jury charge did not distinguish between concealment in order to

achieve the central purpose of the more broadly stated conspiracy (immunization of the taxpayers from tax-evasion prosecution), and concealment intended solely to cover up a completed crime (obtaining the "no prosecution" rulings). Id. at 413-14. To find that the acts of concealment that took place within the limitations period were in furtherance of the conspiracy, the jury needed to find that "the basic aim of the conspiracy was not yet attained" at that time – a determination the jury was not asked to make. Id. at 414.

> As far as we know, therefore, the present convictions were based on the impermissible theory . . . that a subordinate agreement to conceal the conspiracy continued after the central aim of the conspiracy had been accomplished. . . .
>
> [T]he judge's charge left it open for the jury to convict even though they found that the acts of concealment were motivated purely by the purpose of the conspirators to cover up their already accomplished crime. And this, we think, was fatal error.

Id.

The majority fails to recognize that the indictment here is not similarly elastic. The indictment charged a conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B), not a more general conspiracy under section 371 "to defraud the United States, or any agency thereof" by concealing, through various unlawful actions, the theft of Queen's money. Although the indictment's conspiracy allegations included, under the heading

-44-

"Manner and Means," that "[i]t was part of the conspiracy that [defendants] attempted to conceal or disguise the . . . source . . . or control of the illegal cash proceeds by failing to file income tax returns . . . for the tax year 1999," the government's description of a subsequent tax fraud that shared the same concealment objective of the money laundering transactions cannot turn the specific conspiracy alleged – to commit money laundering – into a general conspiracy to conceal funds.[19]

Unlike the section 371 conspiracy charged in Mann, which included a separate tax fraud objective, or the conspiracy charged in Grunewald, whose general purpose to defraud the United States could embrace acts of concealment subsequent to the "no prosecution" ruling, a conspiracy to commit money laundering – i.e., a conspiracy to conduct financial transactions – cannot, by its terms, include a "central criminal purpose" to conceal income from the IRS. Grunewald, 353 U.S. at 405. Put most simply, the tax evasion did not further the "central aim" of the conspiracy, which was to conduct financial transactions in order to conceal the source of the $900,000. Hence, the tax evasion was not within the

---

[19] The indictment originally included a count under section 371 alleging a conspiracy to structure transactions for the purpose of evading federal currency reporting requirements. See 31 U.S.C. §§ 5324(a)(3), 5322. As noted earlier, the district court dismissed that count on the basis of the statute of limitations. See United States v. Upton, 339 F. Supp. 2d 190, 196 (D. Mass. 2004).

-45-

scope of the charged conspiracy. The conspiracy charge was therefore barred by the statute of limitations.

## V.

The majority is correct, of course, that Upton's failure to file the 1999 tax return bears some relationship to the money laundering conspiracy. As I have noted, both crimes share a purpose to cover up the theft from Queen, with the tax evasion presumably having the added purpose to cover up the money laundering. Both the facts and the law, however, preclude a finding by the jury that there was an express original subsidiary agreement among the conspirators to cover up their crime, or a finding that the failure to file the 1999 return was an act of concealment done in furtherance of the money laundering conspiracy within the meaning of Grunewald. Thus, while Upton was charged and properly convicted of the separate crime of failing to file a tax return, the majority errs in treating that independent crime as a part of the money laundering conspiracy.

Because the conspiracy charge was time-barred, Upton's conviction on Count 4 of the indictment should be reversed.